UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| MATTHEW STANFORD,<br><br>        Plaintiff,<br><br>AND<br><br>KENTUCKY ASSOCIATION OF<br>COUNTIES WORKERS'<br>COMPENSATION FUND,<br>        Intervenor Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant and Intervenor<br>        Defendant.<br><br>UNITED STATES OF AMERICA,<br><br>        Third-Party Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CADET<br>CORPS, INC., et al.,<br><br>        Third-Party Defendants. | Civil No. 12-93-ART<br><br><br><br><br><br><br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiff in this heartbreaking Federal Tort Claims Act ("FTCA") case seeks to hold the United States liable for negligently causing him grievous injury while visiting a National Guard training facility in eastern Kentucky. The government now moves to dismiss. It contends the Court lacks jurisdiction because the allegedly negligent government

employees acted pursuant to a discretionary function and thus the FTCA's limited waiver of sovereign immunity does not apply. Since it remains unclear whether the government's alleged conduct fell within its discretion, the Court will deny without prejudice the United States' motion to dismiss and order new briefing on the remaining questions.

## BACKGROUND

This case arises out of a tragic accident at the Harold L. Disney Training Center ("HLDTC"), a military training ground in Artemus, Kentucky, used primarily by the Kentucky Army National Guard and the United States Army Reserve.[1] R. 127 at 7; R. 153 at 3 (accepting this description of HLDTC). At the time of the accident, plaintiff Matthew Stanford was working as an instructor and camp counselor for the United States Army Cadet Corps, Inc. ("Cadet Corps"), a private nonprofit corporation with no official ties to the military. R. 127 at 6–7. Stanford's role was to supervise the young civilian "cadets" and lead them through physical training. *Id.* at 6. During the summer of 2009, Stanford visited HLDTC along with Cadet Corps. *Id.* at 10. While at HLDTC, he and the cadets used the Center's obstacle course, including the "Slide for Life" or "zip line." *Id.* at 12–13. Despite knowing that Cadet Corps intended to use the obstacles on its visit, no one from HLDTC asked the Corps to bring its own safety equipment, gave Stanford a safety briefing, or warned the cadets that certain obstacles were out of order or off-limits. *Id.* at 3, 9–11. And on the

---

[1] The parties dispute many facts surrounding the accident. To the extent the plaintiff's factual allegations are not relevant to jurisdiction, the Court accepts them as true for purposes of the motion to dismiss. But the Court cannot accept as true the parties' allegations regarding jurisdictional facts. *See Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). Jurisdiction over the plaintiff's claims does turn on a few disputed facts concerning particular military regulations. *Compare* R. 108-1 at 13–22 (arguing no mandatory regulations remove the government's discretion) and R. 153 at 9–21 (same), *with* R. 126 at 17–24, 28–34 (disputing that allegation) and R. 127 at 21–28 (same). The Court therefore does not assume the plaintiff's allegations regarding these regulations are correct.

day of the accident, nothing suggested that the zip line was broken or otherwise closed to use.  *Id.* at 12.  The obstacle did not feature fall protections, such as a safety harness, net, or soft materials beneath.  *Id.*  Nevertheless, several of the cadets navigated the zip line without incident, but Stanford sadly did not.  *Id.* at 12–13.  After the zip line cable jerked unexpectedly, Stanford lost his grip and fell to the hard ground below.  *Id.* at 13.  The fall fractured his hip and spine, resulting in quadriplegia.  *Id.*

Stanford sued the United States for negligence pursuant to the Federal Tort Claims Act.  *See* R. 1.  The Kentucky Association of Counties Workers' Compensation Fund ("KACo") also joined the suit as an intervening plaintiff.  R. 12.  Stanford and KACo[2] claim that United States employees 1) failed to warn Stanford that the zip line was not ready for use, R. 1 at 5–7 ¶¶ 39–57; 2) failed to take reasonable steps to guard against an accident on the zip line, negligently designed the zip line, and breached their general duty of reasonably maintaining the premises at HLDTC, *id.* at 7–9 ¶¶ 58–87; and 3) violated various mandatory safety standards and regulations governing the Training Center, *id.* at 7 ¶ 66; R. 81 at 2; R. 100 at 2–5; R. 139 at 2–4.

The United States disavows any fault in Stanford's accident, *see* R. 11, and moved to dismiss Stanford's complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment, *see* R. 108.[3]  The government specifically argues that the Court lacks subject matter jurisdiction over the plaintiffs' claims,

---

[2] Citations are to Stanford's complaint because KACo has adopted Stanford's allegations as its own.  *See* R. 16 at 1 ¶ 1; R. 114 at 1 ¶¶ 2–3; R. 161 at 1 ¶ 3.

[3] Although the United States alternatively seeks summary judgment, the government maintains its motion is properly regarded as a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1).  *See* R. 108-1 at 2.  Focusing only on jurisdiction, the government's brief contains no analysis under Rule 56.  The Court therefore will not analyze the government's motion as one for summary judgment pursuant to Rule 56.

because they challenge the exercise of a "discretionary function" and thus are not covered by the FTCA's waiver of sovereign immunity.

## DISCUSSION

Most of the plaintiffs' arguments against the application of the discretionary function exception are unavailing. But because some legal questions remain, the Court will order new briefing.

## I.    The Federal Tort Claims Act and the Discretionary Function Exception

The Federal Tort Claims Act is a "limited waiver" of the government's sovereign immunity. *Molzof v. United States*, 502 U.S. 301, 305 (1992). Generally speaking, that waiver exposes the United States to liability for torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see also* 28 U.S.C. § 1346(b)(1) (conferring original jurisdiction on district courts over tort claims arising from injuries caused by federal employees that would otherwise be actionable if the United States were a private party). But there are several important exceptions. Federal courts lack jurisdiction over claims arising out of "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of this carve-out, commonly known as the discretionary function exception ("DFE"), is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

Determining whether the DFE bars liability involves a two-part test. *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). First, the Court must determine "whether

4

the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations." *Id.* at 328. If those actions violated a mandatory regulation or policy, the DFE does not apply because without "an element of judgment or choice," the federal employee had "no rightful option but to adhere to the directive." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, even assuming the allegedly tortious conduct was discretionary, the Court must consider whether that conduct is "of the kind that the discretionary function exception was designed to shield" from liability. *Id.* Regardless of an employee's subjective reasons for his actions, if the challenged conduct is objectively "susceptible to policy analysis," then it falls within the scope of the DFE. *See Gaubert*, 499 U.S. at 325. The "nature of the conduct," rather than the rank of the actor, is what matters. *Id.* (internal quotation marks omitted). Government decisions therefore need not be made at the "policymaking or planning" level to be protected by the DFE; day-to-day operational decisions can qualify. *Id.* So, for example, the routine decisions of federal airplane safety inspectors are covered because they require policy judgments balancing compliance, staffing, and funding. *See Varig Airlines*, 467 U.S. at 820.

## II.     The Standard of Review

The DFE is not merely an affirmative defense; it is a jurisdictional bar. If an alleged tort falls within the exception, the Court lacks subject-matter jurisdiction over the associated claim and accordingly must dismiss it. *See Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012). A motion to dismiss based on the DFE is thus properly brought under Rule 12(b)(1). *See Hatcher v. United States*, 512 F. App'x 527, 528 (6th Cir. 2013).

Attacks on subject-matter jurisdiction under Rule 12(b)(1) come in two forms: facial and factual. *See Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.*, 491 F.3d 320, 330 (6th

Cir. 2007). Facial attacks assert that the plaintiff has not sufficiently pled subject-matter jurisdiction. *Id.* When considering a facial attack, the Court must take the plaintiff's allegations as true. *Id.* Factual attacks, on the other hand, challenge the particular facts that support subject-matter jurisdiction. *Id.* When it comes to such jurisdictional facts there is no presumption of truthfulness. *Id.* In response to a factual attack, the Court must weigh the conflicting evidence in the record to determine whether jurisdiction exists. *Id.*; *see also Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (noting court has power to resolve factual disputes on 12(b)(1) motion). And if the record reveals genuine issues of material fact, then the Court can only make the necessary factual findings after a preliminary hearing or hearing at trial. *See Commodities Exp. Co. v. U.S. Customs Serv.*, 888 F.2d 431, 436 (6th Cir. 1989). The standard for determining whether a hearing is needed is thus the same as the standard that applies at summary judgment. *Id.* Absent complex factual questions, the Court is not required to hold a hearing. *See Cook v. Providence Hosp.*, 820 F.2d 176, 178 (6th Cir. 1987).

The government here has mounted both a facial and factual attack on jurisdiction.

**Factual Attack:** The government mounts a factual attack on subject-matter jurisdiction because it argues that no regulation removes federal employee discretion regarding the conduct at issue. *See* R. 108-1 at 13–22; R. 153 at 9–21. The plaintiffs allege the violation of several mandatory regulations, *see* R. 1 at 7; R. 81 at 2; R. 100 at 2–5; R. 139 at 2–4, which meets their initial burden to plead conduct outside the protection of the DFE. *See Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) (holding that the plaintiff must first invoke the court's jurisdiction "by a pleading that facially alleges matters not excepted by § 2680"); *see also Wright v. United States*, 82 F.3d 419, at *3 (6th Cir. 1996)

(unpublished table opinion) (holding that alleging the violation of mandatory regulations satisfies the plaintiff's pleading requirement). But, says the United States, the regulations the plaintiffs invoke either 1) do not apply to the conduct at issue, or 2) are not actually mandatory. For purposes of the DFE, whether a regulation applies and whether it is mandatory are jurisdictional facts. *See Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000) (describing a motion to dismiss based on the lack of mandatory regulations as a factual attack on jurisdiction). The Court therefore cannot assume the plaintiffs' allegations regarding these questions are true.[4] *See Gentek*, 491 F.3d at 330.

**Facial Attack:** The government also mounts a facial attack on jurisdiction because it argues that the alleged conduct is susceptible to policy analysis and thus comes within the scope of the DFE. For the purposes of this second challenge the Court assumes the factual allegations surrounding Stanford's accident are true. *See Gentek*, 491 F.3d at 330.

## III.    Defining the Relevant Conduct

Before applying the two-prong DFE analysis, the "crucial first step" is to properly frame the conduct at issue. *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997). Courts must avoid framing the conduct simply as the failure to exercise due care because

---

[4] When it comes to the government's factual attack the ultimate burden of proof is somewhat unclear. In *Carlyle*, the Sixth Circuit held that once the plaintiff successfully pleads conduct facially outside the DFE, the burden falls to the government to prove the exception actually applies. *See* 674 F.2d at 556. This inverts the normal rule that the burden to prove subject matter jurisdiction rests with the plaintiff. Later, in *Gaubert*, however, the Supreme Court explained that "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." 499 U.S. at 324–25. This created some uncertainty about whether the plaintiff bears the burden to prove the DFE does *not* apply, and this question now divides the circuits. *See S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 n.2 (3d Cir. 2012) (discussing the circuit split); *St. Tammany Parish v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009) (collecting cases). The Sixth Circuit has punted the question, leaving it for another day, *see Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005), and for now, this Court will punt as well. While the burden allocation may ultimately matter to issues left for new briefing, it does not for the jurisdictional facts the Court resolves today.

such a narrow characterization collapses the DFE inquiry into the question of whether the defendants were negligent, and negligence is irrelevant to the DFE. *Id.* at 442. Similarly, an overly broad characterization risks insulating all conduct from liability, because at a high enough level of generality, everything is discretionary. *Id.* For example, "the management and operation" of a campground is too broad, as the decision whether even to have a campground is itself discretionary. *Id.* at 441–42. Since no bright-line test exists, reasoning by analogy from case law is the only guide.

The cases show that the relevant conduct includes both 1) what injured the plaintiff, and 2) the plaintiff's status.

**The Plaintiff's Injury:** Framing the conduct as the design of the specific facilities or the choice of the particular equipment that injured the plaintiff is an appropriate level of generality. Take *Rosebush*. In that case a toddler was burned at a National Forest after falling into a campfire. *Id.* at 440. The court framed the defendants' conduct as how the Forest Service "maintain[s] its campsites and fire pits." *Id.* at 442. Since there was no dispute, however, that the regulations at issue covered public visitors like the plaintiff, it was unnecessary to narrow the conduct explicitly to that class of victims. And the Sixth Circuit in *Kohl*, involving a research experiment gone awry, defined the conduct at a level of generality similar to that in *Rosebush*. The *Kohl* court framed the defendants' conduct as the collection of forensic evidence during field tests, "including decisions about what equipment to use." *Kohl*, 699 F.3d at 942. The alleged cause of Stanford's injury is therefore best characterized as the HLDTC obstacle course's design, warnings, maintenance, and supervision.

**The Plaintiff's Status:** When it comes to injuries on federal property, the plaintiff's visitor status is also a key aspect of the conduct at issue. An unpublished case discussed approvingly in *Kohl* illustrates this point. *See Kohl*, 699 F.3d at 941 (citing *Bell v. United States*, 238 F.3d 419 (6th Cir. 2000) (unpublished table opinion)). The plaintiff in *Bell* slipped on the wet floor of a post office lobby after hours. *Bell*, 238 F.3d 419, at *1. The court framed the conduct at issue as "allow[ing] the lobby area to remain open *to the public* at times when the service windows were closed." *Id.* at *4 (emphasis added). Maintenance for a particular class of visitors, rather than building maintenance generally, was thus the relevant area in which to look for discretion.

Other circuits have also endorsed the principle that the plaintiff's status is relevant to framing the conduct for DFE analysis. The Tenth Circuit relied on that principle in *Weiss v. United States*, 889 F.2d 937 (10th Cir. 1989), a case involving a helicopter pilot injured when he collided with a cable hanging above federal land. The Tenth Circuit held that a seemingly general requirement that the Forest Service mark or eliminate all air hazards was intended only for the benefit of the agency, rather than for members of the public like the plaintiff. *Weiss*, 889 F.2d at 938. The regulation therefore did not remove the government's discretion regarding the conduct in that case. *Id.* at 939. And the First Circuit invoked the same idea in *Ayer v. United States*, 902 F.2d 1038 (1st Cir. 1990), a case involving a civilian visitor injured on a missile launch site. The court in *Ayer* held that the DFE precluded liability because there was "no specific policy or regulation mandating procedures to assure *public safety.*" *Id.* at 1042–43 (emphasis added). *Ayer* even noted that the applicable standards were instead directed at military needs. *Id.* at 1043–44. So for purposes of the DFE's first prong, the plaintiff's status as a civilian visitor on federal land can be just as important to

defining the conduct as how he was injured. Regulations governing safety might not apply to such visitors.

The plaintiffs object that narrowing the relevant conduct to civilian visitors would "create a facile distinction between the level of care owed to the United States soldiers and the rest of the general public allowed access to the same training facility." R. 126 at 16. Far from facile, however, the distinction between the standard of care owed soldiers and that owed civilians is both important and common. As the Supreme Court has noted, military safety involves a unique and delicate balance "of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511 (1988). The distinction between the safety of soldiers and civilians is thus entirely sensible. And that distinction explains why courts in FTCA cases involving public visitors injured on military bases have highlighted the lack of regulations specifically governing the safety of civilians. *See Ayer*, 902 F.2d at 1042–43 (discussed above); *Kelly v. United States*, No. 7:10-CV-172-FL, 2013 WL 5348455, at *6–8 (E.D.N.C. Sept. 23, 2013) (noting in a case remarkably similar to this one that guidelines for safe military use of a Slide for Life might not apply to use by civilian visitors); *Birke v. United States*, No. 4:08-CV-1607-MLM, 2009 WL 1605771, at *9 (E.D. Mo. June 8, 2009) (noting no specific mandatory directives governing civilian tours of a military base); *cf. Strong v. Dyar*, 573 F.Supp.2d 880, 886 (D. Md. 2008) (holding that military orders and regulations do not "constitute an undertaking of an obligation for the benefit of the general public").

But even beyond the military context, it is entirely normal to focus on the class of persons involved to determine whether a particular rule supplies the relevant standard of

care.  That is how negligence per se works.  *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 14 (2010) ("An actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect.").  So, for example, a workplace violation of an occupational safety regulation that happens to injure a visiting invitee rather than an employee would not support a claim of negligence per se.  *Id.* cmt. g.  Similarly, it makes perfect sense to differentiate between soldiers and civilian visitors when framing the conduct for purposes of the DFE.

Taken as a whole, the cases indicate the appropriate characterization of the conduct in this case is allowing civilian visitors to use the military obstacle course at HLDTC.  The Court thus must ask whether any mandatory regulations govern the circumstances under which civilian visitors are permitted such use, including how civilian visitors are approved, supervised, and warned, and how obstacle courses used by civilians are designed and maintained.

## IV.  Applicable Regulations

The plaintiffs argue that several mandatory regulations or policies govern the defendants' conduct in this case, removing their discretion.  These include: 1) Army Field Manual ("AFM") 21-20; 2) Obstacle/Confidence Course Inspection Criteria issued by Army Training and Doctrine Command ("TRADOC"); 3) Kentucky Army National Guard ("KYARNG") Regulation 350-7; 4) National Guard Regulations 420-10 and 415-5, and their associated pamphlets; and 5) unwritten policies governing obstacles and the safety of civilian visitors.  *See* R. 126 at 18–24, 31–32; R. 127 at 22–29.

11

## A. Army Field Manual

AFM 21-20 does not govern obstacle courses used by civilians.[5] For starters, the entire Manual is directed at commanders developing fitness programs for Army personnel, and it is designed to help those leaders "prepare their soldiers to meet the physical demands of war." R. 109-1 at 6 (AFM at iii). Chapter 8 specifically addresses obstacle courses and related drills, and it explains that commanders should use these challenges "to help *soldiers* develop" physical fitness. R. 109-6 at 25 (AFM at 8-1) (emphasis added). Likewise, instructors must give warnings and safety demonstrations "before allowing *soldiers* to run" the obstacles. *Id.* at 26 (AFM at 8-2) (emphasis added). The provisions the plaintiffs rely on are thus expressly directed at design, maintenance, and use of obstacle courses by the military, not civilians. So whether or not AFM 21-20 removes discretion in the military context, it says nothing at all about similar facilities used by nonmilitary visitors. It thus does not cover the conduct at issue in this case.

## B. TRADOC Inspection Criteria

KACo insists that the TRADOC Inspection Criteria provide mandatory construction and safety standards for the obstacle courses at HLDTC. R. 126 at 19. But like the Army Field Manual provisions discussed above, the TRADOC Inspection Criteria also only apply to obstacle courses used *by soldiers*.[6] As the heading of the obstacle checklist provides, it is

---

[5] The parties dispute whether AFM 21-20 even applies to HLDTC staff, *compare* R. 108-1 at 15–16, *with* R. 126 at 18 (KACO), R. 127 at 22–23 (Stanford), but that argument ultimately does not matter.

[6] The United States argues that the TRADOC criteria also only apply to "Initial Military Training facilities" which do not include HLDTC. R. 153 at 15 (quoting R. 126-4 at 6); *see also* R. 108-1 at 20–21. Stanford concedes this point, R. 127 at 27, but KACo does not, R. 126 at 19–20. The declaration of LTC William L. McDaniel, commander in charge of HLDTC during Stanford's accident, suggests HLDTC conducts no initial military training and thus is not a type of facility covered by the Inspection Criteria. *See* R. 111-1 ¶ 3. This is the only evidence in the record on this question, but Stanford contends that the affidavit is defective, because it

directed at "Initial Military Training." R. 126-4 at 2. And the obstacle-specific criteria explicitly supplement AFM 21-20, which suggests they have a similar military scope. *Id.* at 6. Moreover, the description accompanying the schematic of the Slide for Life is also directed expressly at soldiers. *Id.* at 13. Together these textual indicators support the conclusion that the Inspection Criteria are not designed to govern obstacle courses generally, but only those used by the military. So assuming those Criteria apply to HLDTC, they would not govern the inspection, construction, or maintenance of obstacle courses used by civilians like Stanford. But even if they did apply to civilians, inspection criteria generally are not sufficiently mandatory because they require action only if the inspector determines a particular condition exists, and that determination involves discretion. *See Myers v. United States*, 17 F.3d 890, 895–96 (6th Cir. 1994); *cf. Berrien v. United States*, 711 F.3d 654, 661 (6th Cir. 2013) (decision to spot check military contractor's safety compliance fell squarely within discretionary function exception). The TRADOC Inspection Criteria therefore did not remove government discretion regarding the conduct at issue.

## C.    KYARNG 350-7

Stanford and KACo also claim that HLDTC staff lacked discretion because they violated mandatory Kentucky National Guard regulations. They specifically argue that the federal employee who built the Slide for Life failed to get the required approval under KYARNG 350-7. R. 126 at 24; R. 127 at 28. KACo also argues that the officers in charge of Cadet Corps's visit violated KYARNG 350-7 by failing to get approval for that visit from

---

is an unsworn statement. R. 124-1 at 2. The Court need not address the sufficiency of that declaration at this time, however, since even if the Inspection Criteria apply to HLDTC they still do not provide mandatory regulations governing the conduct at issue.

superiors far enough in advance.[7]  *See* R. 126 at 31.  While KYARNG 350-7 governs and was violated, it remains unclear whether state National Guard regulations are relevant to the DFE.  The Court will therefore order new briefing on that question.

**Application to HLDTC:**  The government first contends that KYARNG 350-7 only applies to the Wendell H. Ford Regional Training Center, R. 153 at 18, but by its own terms the regulation also covers "subordinate and associated training areas," R. 127-19 at 6 (KYARNG 350-7 at 6).  And as the parties agree, HLDTC is under the command of Wendell Ford.  *See* R. 127 at 7 ¶ 10; R. 153 at 3 ¶ 10 (concurring).  KYARNG 350-7 therefore governs HLDTC.

The United States nevertheless contends that the particular provisions of KYARNG 350-7 at issue do not apply to HLDTC because a separate chapter of the regulation entitled "Eastern KY Training Sites (Artemus and Hidden Valley)"—a clear reference to HLDTC in Artemus—covers that facility.  *See* R. 153 at 19.  By negative implication, the government argues, that chapter indicates that the rest of the regulation does not govern HLDTC.  *Id.*  But that is a stretch.  First of all, the provisions relating to construction of training areas and approval procedures for civilian visits are generally worded.  And while the chapter the government refers to has a more specific focus than the regulation as a whole, that chapter contains no provisions either contradicting or even pertaining to the same subject matter as

---

[7] The plaintiffs also allege that KYARNG 350-7 requires compliance with AFM 21-20, because it refers to AFM 21-20's discussion of obstacle courses.  R. 126 at 18; R. 127 at 22.  But even if this is true, it makes no difference.  As already discussed, AFM 21-20 only addresses the construction of obstacle courses *used by soldiers*, not civilian visitors.  KYARNG 350-7 does not transform AFM 21-20's scope, so however AFM 21-20 might apply to HLDTC, it does not govern the conduct at issue.

the provisions in question.[8]  The government's construction is thus not plausible because it would effectively repeal the language noted above that specifically provides that KYARNG 350-7 governs Wendell Ford and all subordinate facilities.  The provisions the plaintiffs invoke therefore govern HLDTC as well as Wendell Ford.

But are those provisions mandatory, and did the alleged conduct violate it?  Yes.

**Obstacle Construction:**  Section 6-10(a) of KYARNG 350-7 provides that modifications to ranges and training areas "*shall* be submitted in writing" for approval.  R. 127-19 at 66 (emphasis added).  This does not leave room for discretion, and the parties do not dispute that the officer who built the latest version of the Slide for Life, MSG Charles Kenneth Miles, did not submit a design or get the construction approved.  R. 118 at 6 (Tr. at 17).  And although the record indicates MSG Miles was in federal active duty (and thus not under state command) when he constructed the obstacle, *see id.* at 4 (Tr. at 9–10), the Kentucky regulation covers not just the state's National Guard, but also "all other military and civilian users" of HLDTC.  R. 127-19 at 1 (KYARNG 350-7 at 1).  So KYARNG 350-7 governs, MSG Miles violated it, and Miles lacked discretion because he had no authority to construct the obstacle in the first place.  *See Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986) ("An employee of the government acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect.").

---

[8] The chapter in fact contains no regulations at all, since it is nothing more than a blank page below the title. *See* R. 127-19 at 85.  The chapter evidently was intended as a placeholder for regulations regarding these sites to be filled in later.  *See* R. 153 at 19.

This still leaves one major unanswered question: is KYARNG 350-7 even "a *federal statute, regulation or policy*"? *Gaubert*, 499 U.S. at 322 (internal quotation marks omitted) (emphasis added). Only federal law counts for purposes of the DFE. And the government correctly points out that KYARNG 350-7 is a *Kentucky* regulation, *see* R. 153 at 18, promulgated by the Adjutant General, a state officer, *see* 32 U.S.C. § 314. Identifying KYARNG 350-7 as state or federal for purposes of the DFE is not as simple as pointing to its front page, however, given the National Guard's hybrid state-federal status. On the one hand, the FTCA defines "federal agency" as including "the military departments . . . *of the United States*." 28 U.S.C. § 2671. This might best be construed as not covering state National Guards because they technically are separate from the United States military (even though state guardsmen are also federal reservists). *See Perpich v. Dep't of Def.*, 496 U.S. 334, 345 (1990). On the other hand, state National Guards count as federal agencies for some purposes and not for others.[9] Since precedent indicates that state National Guards may count as federal agencies for purposes of the DFE, the Court will deny without prejudice the government's motion to dismiss and order new briefing on this subject.

---

[9] *Compare Hanson v. Wyatt*, 552 F.3d 1148, 1156 (10th Cir. 2008) (holding that Adjutant General acting in state capacity is not a federal agency under the Administrative Procedure Act when making personnel decisions); *Ellis v. Hanson Natural Res. Co.*, 70 F.3d 1278 (9th Cir. 1995) (unpublished table opinion) (holding that state National Guard is not a federal agency for purposes of FTCA administrative exhaustion requirement); *Gilliam v. Miller*, 973 F.2d 760, 762 (9th Cir. 1992) (reaching a similar result as *Hanson* but holding that state National Guard acts as federal agency when supervising federal technicians); *Schultz v. Wellman*, 717 F.2d 301, 304–05 (6th Cir. 1983) (holding that National Guard personnel decisions are taken "under color of" state law for purposes of § 1983 actions), *with In re Sealed Case*, 551 F.3d 1047, 1049 (D.C. Cir. 2009) (National Guard is a federal agency at all times for purposes of Privacy Act); *Lipscomb v. FLRA*, 333 F.3d 611, 618 (5th Cir. 2003) (Adjutant General was federal agency with respect to his authority over federal employees); *Costner v. Oklahoma Army Nat'l Guard*, 833 F.2d 905, 907 (10th Cir. 1987) (Adjutant General was federal officer for purposes of determining deadline for appeal regarding age discrimination claim); *Chaudoin v. Atkinson*, 494 F.2d 1323, 1329 (3d Cir. 1974) (Adjutant General is federal agency for purposes of mandamus statute).

**Advanced Notice:**  But even assuming KYARNG 350-7 is federal, the alleged violation of provisions governing the approval of visits clearly falls within the DFE because that violation qualifies as an abuse of discretion rather than as a breach of a nondiscretionary duty.  The plaintiffs do not contest that the authorities who approved Cadet Corps's visit had the authority to approve that visit.  They only argue that those officials failed to follow required *procedures* for advance notice of planned visits.  *See* R. 126 at 31.  For purposes of the DFE, however, this sort of procedural violation is properly characterized as an *abuse* of discretion, not a breach of a nondiscrectionary duty.  *See Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983) ("[M]aking a discretionary decision without following mandated procedures should be characterized, for the purposes of the FTCA, as an abuse of discretion.").  That distinction is significant because abuses of discretion remain protected by the DFE.  *See* 28 U.S.C. § 2680(a) (stating that the FTCA does not apply to claims based on discretionary functions, "whether or not the discretion involved [was] abused").  The allegedly deficient notice period thus cannot defeat the DFE.

**D.     National Guard Regulations**

Echoing its arguments regarding KYARNG 350-7, KACo also argues that the failure to get approval for construction of the Slide for Life at HLDTC violated various mandatory *federal* National Guard Regulations because it did not go through the proper approval process.  *See* R. 126 at 20–23.  KACo specifically points to NGR 420-10 and 415-5.  *Id.* Unlike KYARNG 350-7, these regulations are unambiguously federal because they are issued by the National Guard Bureau, a federal agency.  *See* 10 U.S.C. § 10503.  But even as federal regulations, they only apply to state conduct.  And since the officer who built the

Slide for Life was acting exclusively in a federal capacity when he built it, these regulations do not cover his conduct.

Contrary to what one might expect for federal regulations, NGR 420-10 and 415-5 do not actually govern federal construction on state National Guard facilities. Instead, both regulations are directed solely at how *state* Guards conduct their construction. For example, NGR 420-10 and its associated pamphlet are expressly directed at the "conduct and management of State level public works activities." R. 126-1 at 3 (NGR 420-10 § 1-1); R. 126-5 at 4 (NGR Pam 420-10 § 1-1). Even the provision requiring construction approval is directed at state entities. R. 126-1 at 10 (NGR 420-10 § 5-1(b)) (providing that "[n]o entity within the State . . . shall start any project work without" prior approval). NGR 415-5 is no different, providing policies and procedures only for the Adjutant General and the United States Property and Fiscal Officer. R. 126-2 at 4 (NGR 415-5 § 1-1). As already discussed, the Adjutant General is the commander of the state's National Guard, a state officer. *See* 32 U.S.C. § 314. The job of the Property and Fiscal Officer likewise is to oversee how state Guards spend federal funds. *See* 32 U.S.C. § 708(b)(1). NGR 420-10 and 415-5 thus simply do not govern construction done by federal officials.

So far so good, but how does this relate to MSG Miles and construction of the Slide for Life? As it turns out, Miles's status was exclusively federal when he built that obstacle, and the National Guard regulations invoked by KACo therefore do not cover his construction. As Stanford describes in his complaint, "[t]he HDTC staffer who designed and constructed the 'Slide for Life' obstacle . . . was *active duty* / federal status Army National Guard at the time." R. 139 at 2 (emphasis added). Understanding the significance of that

active duty status requires a bit more background on the dual federal-state role of the National Guard.

Organized under Title 32, the "National Guard" comprises the "organized militia of the several States." 32 U.S.C. § 101. As a result, when Guardsmen serve in so-called "Title 32" status they are state officers under state command. *Gilbert v. United States*, 165 F.3d 470, 473–74 (6th Cir. 1999); *see also Maryland for Use of Levin v. United States*, 381 U.S. 41, 47 (1965), *vacated on other grounds*, 382 U.S. 159 (1965) (explaining that state National Guards are commanded and administered by the states); *United States v. Hutchings*, 127 F.3d 1255, 1258 (10th Cir. 1997) (similar); *Knutson v. Wisconsin Air Nat. Guard*, 995 F.2d 765, 767 (7th Cir. 1993) (similar). Despite state control, state Guardsmen are federal employees for FTCA purposes when they engage in service that generally corresponds to "full-time National Guard duty." *Compare* 28 U.S.C. § 2671, *with* 32 U.S.C. 101(19). And those serving specifically as National Guard Technicians are *always* federal employees. *See* 32 U.S.C. § 709(e). Even for Technicians, this federal employee status is mostly nominal, since states still retain command. *See Am. Fed'n of Gov't Employees AFL-CIO, Local 2953 v. Fed. Labor Relations Auth.*, 730 F.2d 1534, 1536-38 (D.C. Cir. 1984) (discussing nominal federal status). In contrast, when the National Guard is called into federal active duty pursuant to Title 10, Guardsmen are completely stripped of their state status and become fully integrated into the United States military, subject to federal command. *See Perpich*, 496 U.S. at 347-48; *In re Sealed Case*, 551 F.3d at 1049–50 (discussing federal active duty under Title 10); *see also* 10 U.S.C. § 101(d)(1) (noting, in definition of "active duty" in U.S. military, that such duty "does not include full-time National Guard duty"). In summary:

Guardsmen can have dual federal-state status when serving under Title 32, but *not* when serving under Title 10.

As such, whether MSG Miles's construction of the Slide for Life is covered by the federal regulations governing state National Guards depends on his Title 32 or Title 10 status. If Miles built the obstacle while serving under Title 32, then he remains a state officer and his conduct is governed by NGR 420-10 and 415-5. If he built the Slide for Life under Title 10, however, he does not come within their scope.

As Stanford alleges, Miles was on federal active duty at the time, R. 139 at 2, which means he was serving under Title 10 and thus was not covered by the federal regulations in question. Stanford's complaint might be read as imprecisely pleading *nominal* federal status under Title 32, but even so, that claim is not supported by the record. Miles testified that during his time at HLDTC he was in federal service on Active Duty Special Work ("ADSW"). R. 118 at 4 (Tr. at 9–10). This assignment status is exclusively federal—full blown federal active duty pursuant to Title 10. *See* Col. Kevin Cieply, *Charting A New Role for Title 10 Reserve Forces: A Total Force Response to Natural Disasters*, 196 Mil. L. Rev. 1, 34 & n.102 (2008). Miles therefore was not serving in a state capacity at all when he built the Slide for Life. Since NGR 420-10 and 415-5 did not apply to Miles's conduct, they could not strip him of discretion.

## E.     Unwritten Policies

The plaintiffs finally contend that HLDTC officers violated several presumably unwritten but nevertheless mandatory polices requiring staff to properly identify and monitor civilian visitors, provide a military sponsor, and include a safety harness with the Slide for Life. *See* R. 126 at 31–32 (generally referring to "mandatory policy" requiring proper

identification of visitors and military sponsors for civilian groups), R. 127 at 26–27 (citing testimony and the inapplicable TRADOC Inspection Criteria as evidence of "established Army policy" requiring fall protection). It is unclear, however, if unwritten policies can remove discretion under the DFE. Some case law suggests that they can, but few opinions specifically address the question.[10] As a result of the uncertainty surrounding this question, the Court will also order the parties to brief the status of unwritten but mandatory policies under the DFE, as well as several related questions described at the end of this opinion.

V.    **Susceptibility to Policy Analysis**

Assuming no Kentucky National Guard regulation or unwritten policy removed the government's discretion, however, the DFE still does not apply unless the challenged conduct is "of the kind that the . . . exception was designed to shield from liability." *Kohl*, 699 F.3d at 940 (quoting *Gaubert*, 499 U.S. at 322–23) (internal quotations omitted). So even if a federal employee's conduct was discretionary, the government still might be liable if that employee committed a garden-variety tort unrelated to policy, like negligent driving. *See Gaubert*, 499 U.S. at 325 n.7. Thus, to be protected by the DFE, the government's conduct must involve public policy judgment "grounded in social, economic, and political policy." *Varig Airlines*, 467 U.S. at 814. This is an objective inquiry: it does not matter whether policy concerns actually formed the basis of the challenged conduct, only that the decision is *susceptible* to policy analysis. *See Rosebush*, 119 F.3d at 444. And according to the Supreme Court, if there is room for discretion, then the government's actions are

---

[10] *See Irving v. United States*, 162 F.3d 154, 166 (1st Cir. 1998) (suggesting an unwritten policy is relevant to the DFE); *Autery v. United States*, 992 F.2d 1523, 1528–29 (11th Cir. 1993) (same); *Padilla v. United States*, No. 09-5651, 2013 WL 5913813, at *8 (C.D. Cal. Oct. 31, 2013) (same); *Sakal v. United States*, No. 09-21933, 2010 WL 3782138, at *3 (S.D. Fla. Sept. 28, 2010) (accepting an unwritten policy as mandatory).

presumably based on policy. *See Gaubert*, 499 U.S. at 324 ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.").

The conduct challenged here—the construction and maintenance of obstacle courses used primarily by the military, associated warnings, and the supervision of civilian visitors— is all susceptible to policy analysis and thus comes within the scope of the DFE. In general, decisions about how to make federal property safe for visitors involve policy judgments requiring careful management of scarce resources, including funds and manpower. *See Hatcher v. United States*, 512 F. App'x 527, 530 (6th Cir. 2013); *Rosebush*, 119 F.3d at 443. The appropriate level of supervision also implicates similar financial and staffing considerations. *See Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 447 (6th Cir. 2005) (security decisions are susceptible to policy analysis); *Carlyle*, 674 F.2d at 556–57 (decision whether to supervise Army recruits was a discretionary function). Decisions about appropriate warnings likewise involve policy concerns including cost, feasibility, and effectiveness. *See Reetz v. United States*, 224 F.3d 794, 797 (6th Cir. 2000); *Rosebush*, 119 F.3d at 443; *Graves v United States*, 872 F.2d 133, 137 (6th Cir. 1989). *But see Caplan v United States*, 877 F.2d 1314, 1316–17 (6th Cir. 1989) (holding in a case predating the objective test established by *Gaubert* that the government's failure to warn of a dangerous condition in a forest did not involve policy judgment and thus was not protected by the DFE). And most importantly, the design of military equipment involves particularly sensitive policy judgments balancing safety and combat effectiveness. *See Boyle*, 487 U.S.

at 511 (describing the design of military equipment as "assuredly a discretionary function" under the FTCA).

The policy concerns discussed across these cases are all equally applicable to the conduct here. Warning signage, safety briefings, and supervising visitors on a National Guard base all require government officials to balance the effectiveness of the obstacle courses, financial considerations, and staff time. The construction and maintenance of obstacle courses like the Slide for Life similarly involve balancing economic and military policy. *See Hawes v. United States*, 409 F.3d 213, 220 (4th Cir. 2005) (finding that a Marine's decision not to complete repairs on an obstacle course over a holiday weekend implicated economic and military policy, and thus claims of unsupervised civilian injured as a result were barred by the DFE). The conduct challenged here thus comes well within the scope of the conduct the DFE is designed to shield. This confirms the Court must address the remaining questions regarding the relevance of state National Guard regulations and unwritten federal policies. The Court will therefore order new briefing addressing both.

## CONCLUSION

For the foregoing reasons, it is accordingly **ORDERED** that:

1) The government's motion to dismiss, R. 108, is **DENIED WITHOUT PREJUDICE**.

2) By **Monday, February 10, 2014**, the United States shall file a renewed 12(b)(1) motion with additional briefing on the following questions:

   a) Do state National Guard regulations promulgated by the Adjutant General such as KYARNG 350-7 count as federal regulations for purposes of the discretionary function exception?

      i)     This discussion should address all of the case law cited in footnote 9 and any other relevant cases the parties are able to find.

b)    Can unwritten but mandatory policies remove discretion under that exception?

      i)     This discussion should address all of the case law cited in footnote 10 and any other relevant cases the parties are able to find.

And assuming unwritten policies are relevant to the DFE:

c)    How is the content and mandatory nature of such unwritten policies proved?  What sort of evidence is relevant to both?

d)    How is the federal status of such unwritten policies proved?  What sort of evidence distinguishes an unwritten policy as federal as opposed to merely a state National Guard policy or a policy local only to HLDTC?

e)    Which party bears the burden of proof to establish the mandatory content and federal status of an unwritten policy?

      i)     In other words, the parties should rebrief and expand their analysis of the burden of proof question the Sixth Circuit noted but ultimately avoided in *Sharp*.  *See* 401 F.3d at 443 n.1.  For opinions examining this question and the surrounding circuit split the parties should look to the cases discussed in footnote 4 of this opinion.

f)    Assuming the plaintiff's allegations regarding Stanford's accident and the surrounding conduct of federal employees are true, did those employees violate any unwritten policies?  Are those policies mandatory?  Are they federal?

3)   Plaintiffs Stanford and KACo shall **RESPOND** no later than **Monday, February 24, 2014**, addressing all of the same questions.

4)   The United States may file a **REPLY** to the plaintiffs' responses no later than **Monday, March 3, 2014**.

   a)   To the extent the plaintiffs raise different arguments the United States may file separate replies to each response, but otherwise the United States shall file a single, consolidated reply.

5)   Stanford's two motions to strike, R. 123 and R. 124, are **DENIED WITHOUT PREJUDICE** because the Court need not rely on the evidence challenged by either motion to decide the government's motion to dismiss. Should the plaintiffs wish to raise the same objections at a later time for the purposes of a motion for summary judgment or other motion, they are free to renew the motions to strike.

This the 21st day of January, 2014.

Signed By:

*Amul R. Thapar*

United States District Judge