UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| MATTHEW STANFORD, <br><br> Plaintiff, <br><br> AND <br><br> KENTUCKY ASSOCIATION OF COUNTIES WORKERS' COMPENSATION FUND, <br> Intervenor Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant and Intervenor Defendant. | Civil No. 12-93-ART |
| UNITED STATES OF AMERICA, <br><br> Third-Party Plaintiff, <br><br> v. <br><br> UNITED STATES ARMY CADET CORPS, INC., et al., <br><br> Third-Party Defendants. | **MEMORANDUM OPINION AND ORDER** |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Plaintiff Matthew Stanford suffered a grievous injury at a National Guard training facility in eastern Kentucky, and he seeks to hold the United States responsible under the Federal Tort Claims Act ("FTCA"). The government contends that its allegedly negligent conduct concerns the performance of a discretionary function, and is thus not covered by the

FTCA's waiver of sovereign immunity. Invoking the FTCA's discretionary function exception ("DFE"), the United States moved to dismiss for lack of jurisdiction, but the Court denied that motion without prejudice to allow for new briefing on some difficult questions. The government then renewed its motion to dismiss. The Court now answers some of those questions, and will hold a hearing to resolve key jurisdictional facts.

## BACKGROUND

The Court recounted the tragic facts of this case in its prior opinion addressing the DFE. *See Stanford v. United States*, No. 12-93-ART, 2014 WL 222009, at *1 (E.D. Ky. Jan. 21, 2014). For the purposes of this opinion, a brief review suffices.

Matthew Stanford served as an instructor and counselor for the United States Army Cadet Corps, Inc. ("Cadet Corps"), a private military-style youth organization. Stanford helped lead the group on a visit to the Harold L. Disney Training Center ("HLDTC"), a National Guard training ground in Artemus, Kentucky. *Id.* While at HLDTC, Stanford and the cadets used the Center's obstacle course, including the "Slide for Life" or "zip line." *Id.* Although the zip line featured no fall protections, several cadets navigated the slide without incident. *Id.* Stanford sadly did not: After the cable jerked unexpectedly, he lost his grip and fell to the hard ground below, fracturing his hip and spine. *Id.* As a result of the fall, he is now severely paralyzed. *Id.*

Stanford sued the United States under the FTCA for negligence, and the Kentucky Association of Counties Workers' Compensation Fund ("KACo") joined the suit as an intervening plaintiff. *Id.* Among their allegations, the plaintiffs claim that federal employees at HLDTC failed to warn Stanford adequately, failed to take adequate safety precautions,

negligently designed the zip line, and violated various regulations. *Id.* Relying on the DFE, the government moved to dismiss for lack of subject matter jurisdiction. *Id.* at *2.

The Court addressed many of the parties' arguments but ultimately denied the government's motion without prejudice, requesting new briefing on some stubbornly difficult legal questions. *Id.* at *12. In its prior opinion, the Court held the following: Most of the regulations the plaintiffs say removed the employees' discretion did not apply at all. *Id.* at *6–10. In particular, the Army materials governing obstacle courses are geared towards official use by the *military* rather than by civilian visitors like Stanford. *Id.* at *6–7. And certain federal National Guard Regulations ("NGR") concerning construction by state Guards did not apply to the zip line at HLDTC, because the officer who built the zip line did so while serving in an exclusively federal capacity. *Id.* at *9–10. Moreover, because the federal employees' alleged conduct in this case is susceptible to policy analysis, the DFE would preclude liability, were it not for questions surrounding other potentially binding regulations. *Id.* at *10–11.

Two regulations, the Court found, might overcome the DFE. The first is Kentucky Army National Guard ("KYARNG") Regulation 350-7, a *state* regulation for Kentucky's own Guard (importantly distinguished from the federal NGRs, which apply to *all* state Guards). The Court concluded that KYARNG 350-7 § 6-10(a) had been violated because MSG Charles Kenneth Miles, the Guardsman (and federal employee) who built the zip line, failed to get the proper approval for his construction. *Id.* at *8. He thus lacked discretion. Underlying this conclusion, the Court assumed § 6-10(a) covered internal HLDTC employees like MSG Miles. Some uncertainty remained, however, as to whether KYARNG 350-7, promulgated by Kentucky's Adjutant General, a state officer, was a "*federal* statute,

3

regulation or policy" relevant to the DFE. *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). The plaintiffs also alleged that federal employees at HLDTC violated various unwritten policies regarding the identification and supervision of civilian visitors, and zip line safety. *Id.* at *10. The Court was similarly unsure whether such unwritten policies could remove discretion under the DFE, and if so, which party bears the burden of proof to show their existence and content. *Id.* at *10, *12. As a result, the Court ordered new briefing, and the government renewed its motion to dismiss addressing the outstanding issues.

## DISCUSSION

### I. Revisiting Some of the Court's Prior Holdings

Although the Court only requested that the parties address three additional questions in their renewed briefing, both the plaintiffs and the government have included arguments questioning the Court's prior holdings. The Court will take up the parties' invitation to revisit its earlier opinion because it has a duty to correct its own errors, and before final judgment, there is no bar to reversing course. *See Marconi Wireless Tel. Co. v. United States*, 320 U.S. 1, 47–48 (1943); *Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82 (1922). Correcting errors now, rather than on appeal, will also save the parties resources in the long run.

### A. KYARNG 350-7

The United States strongly suggests the Court erroneously assumed that KYARNG 350-7 § 6-10(a) applies to internal personnel such as MSG Miles. *See* R. 166-1 at 11–12 n.3. Section 6-10(a) must be construed in line with its neighboring provisions, the government says, and those regulations are expressly directed at visiting units training at HLDTC. This

makes clear, the argument goes, that the procedures described in § 6-10(a) have the same limited scope. Hence, as an HLDTC officer rather than a visiting trainee, MSG Miles did not need approval to build the zip line—KYARNG 350-7 simply did not cover his construction at all. The upshot? It ultimately does not matter whether KYARNG 350-7 is state or federal because it did not remove his discretion.

Upon further consideration, the United States is correct. As discussed in more detail below, much of KYARNG 350-7 regulates military units training at HLDTC. Read not in isolation but in context, section 6-10(a)'s approval requirements for building and modifying "training areas" or "existing facilities" (such as obstacle courses) are no different. R. 127-19 at 66. And as a result, KYARNG 350-7 did not rob MSG Miles of discretion to build or modify the zip line. The Court accordingly reverses its prior holding to the contrary.

The rest of § 6-10 is the first clue that the construction approval procedures only apply to visiting units. As the government points out, adjacent language in 6-10(b) is directed at units training at HLDTC: "Temporary ranges and training areas shall be restored to their original condition prior to the *unit* clearing the training area . . . ." *Id.* (emphasis added). Section 6-10(d)(1) likewise requires the "[u]sing unit" to submit particular forms to gain approval for digging "tactical field excavations" such as foxholes. *Id.* Since the rest of § 6-10 (Construction and Modification of Ranges/Training Areas) regulates training units, it stands to reason that § 6-10(a) does so as well; unless the text clearly indicates otherwise, adjacent subsections on similar topics presumably have the same scope. *See, e.g.*, *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1366 (Fed. Cir. 2013) (inferring provision's scope from the subject of "neighboring provisions"); *cf. Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) (explaining that statutes "should not be read as a series of

5

unrelated and isolated provisions"); *Fex v. Michigan*, 507 U.S. 43, 49 (1993) (drawing on the "import of related provisions"). The focus on approval for *temporary* training areas also strongly suggests that § 6-10 addresses short-term users of HLDTC's facilities, not permanent personnel.

Neighboring sections within Chapter 6 also expressly contemplate visiting military units training on the grounds. For example, KYARNG 350-7 § 6-9 directs units to get approval for road-block exercises, and to remove debris from the roads after the exercises are complete. *Id.* at 65–66. Section 6-11 similarly concerns each unit's duty to repair damage and clear hazards after training on the grounds. *Id.* at 66–67. Section 6-12 also directs units to appoint a fire marshal, and to observe certain fire safety protocol. *Id.* at 67–69. And § 6-13 permits "[o]rganizations" to use HLDTC's facilities for washing vehicles, within certain parameters. *Id.* at 69–70. Taken together, all these neighboring provisions strongly suggest that § 6-10(a)'s approval requirement for the construction or modification of obstacles, read most fairly, does not cover internal HLDTC personnel like MSG Miles. KYARNG 350-7 thus did not govern his construction of the zip line, which also means the Court need not decide the sticky question of whether that regulation is federal under *Gaubert*. So, as it turns out, KYARNG 350-7 does not even apply, contrary to the Court's initial holding.

**B.     National Guard Regulations and MSG Miles's Status**

Stanford and KACo expressly ask the Court to revisit its prior opinion. They specifically contest the Court's prior holding that certain National Guard Regulations only apply to the approval of construction projects by state Guards (and thus do not cover fully federalized Guardsman serving under Title 10 like MSG Miles). R. 169 at 18–19; R. 170 at

6

7–12. The plaintiffs argue that as used in the regulations, the word "state" is merely a geographic term—a reference to administrative units—rather than a term referring to political entities. R. 170 at 9. The regulations apply to *all* construction on National Guard facilities, they say, regardless of whether it is performed by state or federal actors.

This reading is implausible. As discussed in the Court's earlier opinion, this ignores specific language in the Regulations narrowing the regulations to "state level" projects. *See Stanford*, 2014 WL 222009, at *9. Shot throughout the regulations at issue is language indicating that they are directed at the states as sovereign agents. This suggests that the regulations govern only construction by state National Guards.

To begin with, the regulations emphasize that "the States, and not the Federal government, operate and maintain all ARNG facilities." R. 126-1 at 3 (NGR 420-10 § 1-5(a)); R. 126-2 at 4 (NGR 415-5 § 1-7(a)). And the authority behind the regulations is the Chief of Installations, National Guard Bureau, Army Installations Division, R. 126-1 at 1, which according to the regulations themselves, "provides resources and approved policy guidance to the States and Territories." R. 126-1 at 4 (NGR 420-10 § 2-5(a)); R. 126-2 at 5 (NGR 415-5 § 2-7(a)). Right out of the gate, then—without knowing much else about the regulations' text—the plaintiffs' reading faces an uphill climb because the audience is plainly the states as political entities.

The text confirms, however, that the regulations are directed at construction *by* the states, not simply in a particular state. For example, take NGR 420-10, the regulation requiring construction approval, which the plaintiffs say MSG Miles violated. That regulation's entire scope is "the responsibilities, organization, functions, and personnel for State Construction and Facilities Management Offices." R. 126-1 at 1. The Construction

and Facilities Management Officer ("CFMO") "is the principal *State staff officer* for the organization, control and accomplishment of facilities engineering . . . ." R. 126-1 at 7 (NGR 420-10 § 4-1(a)) (emphasis added). The CFMO also answers to the Adjutant General ("AG"), another state officer. *Id.* at 5 (NGR 420-10 § 2-7); *id.* at 9 (NGR 420-10 § 4-2(a)). This all demonstrates that the target of the regulations is construction by *state* National Guards. The goal is not to regulate purely federal actors doing construction on National Guard facilities, like MSG Miles. The Court thus stands by its original interpretation of NGR 420-10 and the related regulations discussed in its earlier opinion.

But that is not the end of the story when it comes to the National Guard Regulations. Even under the Court's original interpretation, the NGRs might not be irrelevant after all, because the Court erroneously concluded that MSG Miles must have been fully federalized under Title 10 due to his Active Duty Special Work ("ADSW") assignment. As Stanford points out, however, Guardsman can serve on ADSW under Title 32, which means MSG Miles might have been acting in both his federal and state capacities when he built the zip line. *See* R. 176 at 4–5; *see also* R. 176-2 at 1 ("Service covered under Title 32 U.S. Code includes . . . Active Duty for Special Work . . . ."). Stanford has even provided copies of MSG Miles's ADSW orders indicating Title 32 as the underlying authority. *See* R. 176-1 at 4–17. As such, his construction might be covered by the regulations at issue.

The United States does not even dispute that possibility as a legal matter—and thus does not dispute that the Court erred in its original opinion—but rather contends that MSG Miles was probably not in Title 32 status at the time. *See* R. 179 at 1–2. Miles is not sure when he built the revised zip line, but it was probably 2007. R. 118 at 8 (Tr. at 28). The government notes that Miles testified that he served at HLDTC for about nine months over

the course of 2006 to 2007, *see* R. 179 at 2, but the orders provided cover only a fraction of that period, *see* 176-1 at 4–17. Therefore, there is a dispute of material jurisdictional fact: If MSG Miles was in Title 10 status when he built the zip line, as the Court originally assumed, the National Guard Regulations do not apply and thus do not remove discretion; but if Miles was instead in Title 32 dual-status, then the DFE might not apply because NGR 420-10 § 5-1(b) requires approval from the CFMO (among others) for all construction, which Miles did not obtain. The Court accordingly will hold a hearing to determine MSG Miles's status at the relevant time. *See Commodities Exp. Co. v. U.S. Customs Serv.*, 888 F.2d 431, 436 (6th Cir. 1989) (holding that district court should hold hearing on disputed issues of jurisdictional fact).

C. **Department of Defense Directive 4270.05**

KACo points to a new document, Department of Defense Directive 4270.05 ("DoDD 4270.05")—not raised earlier—that supposedly demonstrates that MSG Miles, even if on purely federal active duty when he built the zip line, violated mandatory federal procedures for construction on National Guard facilities. *See* R. 170 at 8–9. That document, however, is at most a general guideline: "The National Guard shall *normally* use the services of the U.S. Property and Fiscal Officer . . . for the design and construction" of covered military facilities. R. 170-6 at 4 (§ 4.3.4.1) (emphasis added). Hardly a mandatory command. Most importantly, DoDD 4270.05 makes no attempt to define what construction counts as "normal," and what might otherwise be permissible outside the usual channels. As a result, the document does not show that MSG Miles lacked discretion, as a matter of federal policy, to build the zip line. *See Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997)

9

(holding that to remove discretion, a statute or regulation must provide a "*specific* manner" of conduct).

**D.  Susceptibility to Policy Analysis**

The plaintiffs also challenge the Court's prior conclusion that the government's conduct is susceptible to policy analysis.  R. 169 at 31–35; R. 170 at 2–7.  Stanford and KACo specifically argue that the failure to warn of the zip line's dangers—the failure to provide even a simple warning sign—is not susceptible to policy analysis and thus not covered by the DFE.  *See* R. 170 at 5–6.  KACo also suggests that the decision to allow civilian visitors onto HLDTC in the first place similarly is not protected by the DFE.  *Id.* at 2–4.  KACo further contends that small-scale military construction projects like the zip line are not susceptible to policy analysis.  *Id.* at 6–7.  None of these new arguments warrant altering the Court's prior holdings.

**The Warnings:**  The Court is admittedly skeptical that the failure to provide a warning in this context is objectively susceptible to analysis based on social, economic, or political policy.  *See Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (holding that the failure to post adequate warning signage on a commuter road in an urban park "does not implicate political, social, or economic decisions of the sort that the [DFE] was designed to protect"); *Boyd v. U.S. ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895, 898 (10th Cir. 1989) (holding that the "failure to warn swimmers of dangerous conditions in a popular swimming area does not implicate any social, economic, or political policy judgments").  To be sure, the line between garden-variety torts and injuries "associated with activities of a more obviously governmental nature" is blurry.  *Totten v. United States,* 806 F.2d 698, 700 (6th Cir. 1986).  But the alleged conduct here does not fit comfortably on the government-

10

function side of the line. And if little more than the basic cost-benefit considerations behind the standard of care, *see United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.), are sufficiently policy-laden to trigger the DFE, then the exception will "swallow the entire [FTCA]," *Rosebush*, 119 F.3d at 445 (Merritt, J., dissenting). As such, putting the Sixth Circuit's precedents aside—working with a blank slate—the Court probably would be inclined to hold that the failure to warn in this case is not conduct "of the kind that the discretionary function exception was designed to shield." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).

But the Court does not face a blank slate. This Court must follow binding precedent from the Court of Appeals. And when it comes to visitors on federal property, the law in this circuit appears categorical: "[T]he decision whether to warn of potential danger is a protected discretionary function." *Rosebush*, 119 F.3d at 443. If, as in *Rosebush*, the failure to place a warning sign near a campground about the danger of fire pits is susceptible to policy analysis, it is hard to imagine a failure to warn visitors that would not be. The Court in *Rosebush* found that the DFE applied because deciding whether to warn visitors involved balancing the needs of campers, effectiveness, aesthetics, cost, environmental impact, and vague "other considerations." *Id.* at 444. Many of the same policy concerns apply here. As the Court noted in its prior opinion, decisions about warning signage at HLDTC "require government officials to balance the effectiveness of the obstacle courses, financial considerations, and staff time." *Stanford*, 2014 WL 222009, at *11. As a result, according to the Sixth Circuit's understanding at least, the failure to warn in this case is susceptible to policy analysis and thus covered by the DFE.

**Allowing Civilians on HLDTC:** KACo also appears to suggest—although it is not entirely clear—that the decisions to: (1) Admit civilians onto HLDTC *at all*; and (2) to allow them to use the facility's equipment *under any conditions* are not susceptible to policy analysis, and thus not protected by the DFE. *See* R. 170 at 2–4. That question does not matter to this case, however, because the plaintiffs' negligence claims are not so categorical. Stanford and KACo challenge not the general decision to allow civilian groups like the Cadet Corps on base, but the *specific circumstances* under which HLDTC staff approved the Corps' visit and supervised the group while using the facility. *See* R. 126 at 31–32 (referring to mandatory policies requiring proper identification of visitors and military sponsors for civilian groups); R. 139 at 3–4 (alleging violation of civilian supervision policy). And as the Court already explained, security and supervision decisions are susceptible to policy analysis because they require delicate balancing of financial and staff resources. *Stanford*, 2014 WL 222009, at *11. Those considerations are heightened at a military facility like HLDTC.

**Small-Scale Construction:** KACo also argues that the design of the zip line is analogous to the U.S. Navy's conduct in *Gotha v. United States*, 115 F.3d 176 (3d Cir. 1997), which involved an unsafe path lacking a stairway, railing, and lighting. The court in *Gotha* refused to apply the DFE, holding that the design of the path did not involve policy, but "rather was a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." *Id.* at 181. KACo says the negligent design and maintenance of the zip line is similar because such small scale projects are not rooted in policy analysis. R. 170 at 7. But the court's analysis in *Gotha* was not about scale, it was about the connection to military affairs. Unlike the path at issue there, the zip line has a military purpose: It is designed to train

National Guardsmen and other soldiers. *See Hawes v. United States*, 409 F.3d 213, 220 n.5 (4th Cir. 2005) (distinguishing *Gotha* because the construction there "had no relation to the military or to national security," while an obstacle course, in contrast, is designed "to train [soldiers] for combat"). And as the Supreme Court explained in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 511 (1988), the design of military equipment is "assuredly a discretionary function." This applies to equipment for training no less than it does to equipment used on the battlefield. *See Hawes*, 409 F.3d at 220–22 (treating an obstacle course as "military equipment" that involves sensitive judgments of military policy and effectiveness).

**E.    Framing the Conduct**

Finally, Stanford objects to how the Court framed the conduct at issue. He maintains that because the case involves multiple actors acting at different times, the Court should not have "reduced" the allegedly negligent conduct "to a single sentence," but rather should have broken the conduct down into its component claims. *See* R. 169 at 34–35. The Court has absolutely no idea what this argument is getting at, because Stanford does not explain how a different framing of the conduct (merely a new verbal formulation?) would change the DFE analysis. Stanford suggests the Court's framing is somehow "overbroad," but he does not explain why or offer any alternaive analysis. As such, this argument is waived: "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (internal quotation marks and alterations omitted). For it is not the Court's duty to take this confusing argument and "put flesh on its bones." *Id.* at 996.

But regardless, the framing of the conduct at issue in this case hardly prevented claim-by-claim DFE analysis of separate alleged incidents. In its prior opinion, the Court initially described the relevant conduct as such: "[T]he circumstances under which civilian visitors are permitted [use of the military obstacle course at HLDTC], including how civilian visitors are approved, supervised, and warned, and how obstacle courses used by civilians are designed and maintained." *Stanford*, 2014 WL 222009, at *6. The Court then later again summarized the conduct as "the construction and maintenance of obstacle courses used primarily by the military, associated warnings, and the supervision of civilian visitors." *Id.* at *11. That the conduct was summarized in a single sentence had no impact, however, on whether a specific regulation governed construction of the zip line several years ago, or whether that construction was susceptible to policy analysis. Each incident was evaluated separately—the construction, inspections, warnings, safety and security procedures, etc. In other words, the Court analyzed whether the proffered regulations governed any specific component of the conduct at issue, and then addressed whether each component was susceptible to policy analysis. It is hard to see how this is inconsistent with Stanford's proposed change; that change, therefore, seems to be no more than semantics.

## II. Unwritten Federal Regulations or Policies

Now that the Court's prior opinion has been thoroughly reexamined—and one of the questions designated for new briefing avoided—what about the status of unwritten federal regulations? Can they remove discretion for purposes of the DFE? Unfortunately, the limited cases involving unwritten policies and the DFE are of little help, because they do not squarely address the question. *See Stanford*, 2014 WL 222009, at *10 n.10 (collecting cases). The Sixth Circuit has explained that "it is more likely that government agents are

14

exercising discretion" when written sources are silent, *Kohl v. United States*, 699 F.3d 935, 942 n.2 (6th Cir. 2012), but the court did not reject the proposition that unwritten policies could remove discretion for purposes of the DFE. In fact, the Court of Appeals apparently assumed that proposition in a recent case. In *Anestis v. United States*, No. 13-6062, 2014 WL 1499844, at *7–8 (6th Cir. Apr. 18, 2014), the Sixth Circuit concluded that an evidently unwritten but mandatory Veterans Administration ("VA") policy removed discretion from employees, requiring them to treat all patients in urgent medical need, regardless of eligibility for veterans benefits. Looking to testimony from VA administrators to prove the mandatory nature of the policy, the Court necessarily assumed that unwritten policies count for purposes of the DFE—but did not explicitly address the issue (nor was the issue briefed by the parties). A conclusive holding on the issue thus awaits a future case.

Nevertheless, the Sixth Circuit's assumption finds support in the Supreme Court's precedents on the DFE. Early language from the Court suggests, however, that courts may look only to written sources to determine whether a federal employee lacks discretion: The DFE does not apply, the High Court tells us, "when a federal statute, regulation, or policy specifically prescribes a course of action" because in such cases, "the employee has no rightful option but to adhere to the directive." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "Policy" is admittedly ambiguous, but a word is known by its associates in an opinion no less than in a statute. (*Noscitur a sociis*, in other words, is a sensible general rule of interpretation.) As such, since "policy" is adjacent to "statute" and "regulation"—two written sources—the list of three suggests "policy" also refers to something written.

But *Berkovitz* is not the final word on the matter. After dutifully reciting the "statute, regulation, or policy" passage from *Berkovitz*, the Supreme Court in *United States v.*

15

*Gaubert*, 499 U.S. 315 (1991), strongly implied that unwritten policies can be just as mandatory as written regulations: "Not all agencies issue comprehensive regulations, however. Some establish *policy* on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs." *Id.* at 324 (emphasis added). This language from *Gaubert*, combined with the Sixth Circuit's recent opinion in *Anestis*, indicates that unwritten federal policies can sufficiently remove discretion so as to overcome the DFE. Common sense also supports this conclusion. Agency heads and other executive officers can surely remove federal employees' discretion through unwritten directives, because if these directives do not count for purposes of the DFE, the government could avoid liability simply by opting not to put federal policy in writing. Excluding unwritten policies also creates an anomaly that is inconsistent with the FTCA's text: Despite *equally lacking discretion*, federal employees violating written policies would be treated differently from those violating unwritten ones. The DFE, however, speaks only in terms of "discretionary function[s]," not the source of the discretion (or its removal). *See* 28 U.S.C. § 2680(a). The Court will therefore schedule a hearing to determine whether a mandatory federal policy removed HLDTC employees' discretion regarding their allegedly negligent conduct.

## III. The Burden of Proof

As to the allocation of the burden of proof at the hearing, that burden rests, in this circuit at least, with the government. Although the Courts of Appeals are split on the issue, *see St. Tammany Parish v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009) (discussing the split), according to the Sixth Circuit, once an FTCA plaintiff pleads conduct outside the DFE's scope, the burden shifts to the government to prove the DFE actually applies. *See Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) (holding that "after a

plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not" covered by one of the FTCA's exceptions, "the burden fall[s] on the government to prove the applicability of a specific" exception). The DFE is more akin to an affirmative defense, the reasoning goes, and hence the burden belongs on the government since it is in a better position to assert the appropriate FTCA exception. *See Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). This burden allocating scheme is arguably inconsistent with traditional pleading rules, which normally assign the burden of proof to the party who must plead an issue. *See* Ugo Colella & Adam Bain, *The Burden of Proving Jurisdiction Under the Federal Tort Claims Act: A Uniform Approach to Allocation*, 67 Fordham L. Rev. 2859, 2894 (1999). And since the DFE is jurisdictional, *see Stanford*, 2014 WL 222009, at *3, the unusual placement of the burden is also in deep tension with the principle that federal courts, as limited tribunals, are presumed to *lack* jurisdiction until the party invoking the Court's power proves otherwise. Colella & Bain, *supra* at 2894–95. But regardless, *Carlyle* is still good law, binding on this Court.

The government suggests that despite *Carlyle*, the Sixth Circuit in practice places the burden on the plaintiff to prove that a mandatory regulation or policy removed federal employee discretion. R. 166-1 at 23–24. But none of the cases cited necessarily goes that far; each simply analyzed the regulations raised by the plaintiff, holding they did not remove discretion. *See Reetz v. United States*, 224 F.3d 794, 796 (6th Cir. 2000) (holding that some regulations conferred discretion while others cited by the plaintiff did not even apply); *Rich v. United States*, 119 F.3d 447, 450–51 (6th Cir. 1997) (holding that the regulations were merely advisory guidelines); *Rosebush*, 119 F.3d at 442 (holding the regulations "vest complete discretion"). These cases are consistent with the plaintiff's initial burden to *plead*

17

regulations that remove discretion, as well as the government's subsequent burden to show otherwise. For the government, carrying that burden requires interpretation, which is reflected in the Sixth Circuit's analysis. Such interpretation thus hardly implies that the burden of proving a mandatory policy ultimately rests with the plaintiff.

There is some uncertainty, however, surrounding the appropriate allocation of the burden of proof in DFE cases in light of the Supreme Court's decision in *Gaubert*, issued after *Carlyle*. According to the *Gaubert* Court, "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of a regulatory regime." 499 U.S. at 324–25. Some courts have suggested this language may place the burden on the plaintiff to prove the DFE does not apply. *See, e.g.*, *Autery v. United States*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993) (observing without deciding that "the Supreme Court appeared to impose the burden on the tort plaintiff to show that the government's conduct is not protected under the discretionary function exception"). The Sixth Circuit has not yet addressed whether *Gaubert* changed the scheme. *See Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 n.1 (6th Cir. 2005) (expressly punting on the question). But the precise language in *Gaubert* that supposedly upsets the old burden allocation is nothing more than a restatement of the pleading rule laid out in *Carlyle*. *See* 674 F.2d at 556 (holding that an FTCA plaintiff must first "invoke[ ] jurisdiction by a pleading that facially alleges matters" outside the DFE). As the Ninth Circuit explained, "*Gaubert* . . . did not deal with the burden of proof question." *Prescott*, 973 F.2d at 702 n.4. The Supreme Court therefore has not implicitly overruled *Carlyle*. And since the Sixth Circuit in *Sharpe* did not change course, *Carlyle*, right or wrong, remains binding.

18

## CONCLUSION

For the foregoing reasons, it is accordingly **ORDERED** that a hearing to resolve outstanding disputes over jurisdictional facts relevant to the DFE is **SCHEDULED** for **Monday, July 28, 2014**, at **1:00 p.m.**, at the United States Courthouse in **Covington**, Kentucky. At this hearing the government will bear the ultimate burden of proof. The parties should be prepared to address the following questions, with support from any relevant documents, witnesses, or other exhibits and competent proof they choose to introduce:

(1) Was MSG Charles Kenneth Miles in Title 10 or Title 32 status when he built the zip line? In other words, was he acting in an exclusively federal capacity, or in a dual federal-state capacity?

(2) Assuming the plaintiff's allegations regarding the conduct of HLDTC staff are true, did that conduct violate any unwritten mandatory (nondiscretionary) federal policy regarding fall protection, identification and supervision of visitors, or any other topic? To address this question the parties should specifically offer proof not only on the content of any alleged unwritten policy, but also on:

(a) Whether any such policy is federal or state, and

(b) Whether any such policy is mandatory or merely an advisory guideline.

This the 9th day of June 2014.



Signed By:
*Amul R. Thapar*  AT
United States District Judge